## THE STATE OF KANSAS v. GEORGE W. ROGERS.

54 683
s56 363

54 683
e65 715

1. BURGLARY — *Breaking into Courthouse.* A building occupied as a courthouse, in which valuable records and papers belonging to the county are kept and deposited, may be the subject of the crime of burglary in the second degree, and is included within the term " other buildings," in ¶ 2195 of the General Statutes of 1889.

2. JURORS — *Challenges, Overruled.* Under the facts disclosed by their examinations, this court finds no error in the action of the trial court in overruling the challenges to jurors.

3. CHANGE OF VENUE — *Denial of, not Reversed.* An application for a change of venue having been made, and a very large number of affi-

davits having been introduced on each side, with reference to the existence of prejudice in the minds of the people of the county against the defendant, and the finding of the court on such application denying the change of venue being supported by ample evidence, this court will not reverse its ruling merely because there is evidence tending to prove the grounds of the defendant's application.

4. CONFESSIONS, *When Inadmissible as Evidence.* The admissions or confessions of an alleged co-conspirator with the defendant in the commission of crime, made after the offense had been fully consummated, and the criminal design fully carried out, are inadmissible on the separate trial of the defendant for any purpose.

### *Appeal from Harvey District Court.*

GEORGE W. ROGERS, convicted of burglary, appeals. The opinion herein, filed February 9, 1895, contains a sufficient statement of the facts.

*T. B. Wall, O'Bryan & Gordon,* and *Willard Kline,* for appellant.

*C. E. Branine,* county attorney, and *A. L. Greene,* for The State.

The opinion of the court was delivered by

ALLEN, J.: The defendant, George W. Rogers, and George H. Shirley were jointly charged in two counts with the crime of burglary. The first count charged the felonious breaking and entering a building belonging to Philip Bretch and others, occupied by Harvey county as a courthouse, in which were kept and deposited the books and records of Harvey county, with the intent to steal said books and records. The second count differs from the first only in that it charges that the breaking was with the intent to set fire to, burn and destroy said books and records. The defendant was convicted on the second count, and sentenced to confinement in the penitentiary for the term of five years. From this conviction and sentence he appeals. Various errors are assigned, which will be considered in the order of their statement in the appellant's brief.

I. A motion was made to quash the information, on the ground, among others, that it does not state a public offense.

The particular objection is that a courthouse, in which public records are kept, is not such a building as is meant by the statute defining the crime of burglary in the second degree. The information is based on the provisions of ¶ 2195 of the General Statutes of 1889, which reads as follows:

"Every person who shall be convicted of breaking and entering in the night time: *First,* any building within the curtilage of a dwelling house, but not forming a part thereof; or, *second,* any shop, store, booth, tent, warehouse, or other building, or any boat or vessel, in which there shall be at the time some human being, or any goods, wares, or merchandise, or other valuable thing, kept or deposited, with intent to steal or commit any felony therein, shall, on conviction, be adjudged guilty of burglary in the second degree."

It is said that the term "other buildings" must be held to refer to buildings of the same general character as those specifically mentioned, and that the phrase "or other valuable thing" really means no more than goods, wares or merchandise. It is argued that a courthouse and the records therein are public property of a character altogether dissimilar from private stores, warehouses, and their contents; that in another section of the statute, defining the crime of arson, public buildings are specifically mentioned, and that their omission from this section indicates that the legislature did not intend that they should be included under the general term "other building." Numerous cases are cited in support of this contention; among others, that of *The People v. Richards,* 108 N. Y. 137. That was a prosecution for breaking and entering a structure for the permanent interment of the dead, built above ground. While there is some language used in the opinion of the court which gives support to the appellant's position in this case, the decision, after all, is to the effect that a place of burial for the dead, even though built above the ground, and costly, is not included within the statute. The fact is commented on that it was "really nothing more than a grave above ground," and the court expressly restricted the decision to the case presented.

While we are satisfied with the reasoning of the court as

applied to that case, we do not regard it as decisive of the one now presented. To constitute burglary, under the second clause of the section under consideration, there must be a breaking and entering in the nighttime of a building, booth, or tent; there must be a human being therein, or goods, wares, or merchandise, or other valuable thing, must be kept or deposited therein; and the breaking must have been with the intent to steal, or commit a felony. The crime of burglary in the first degree can only be committed in a dwelling house. By another section of the statute, station houses, depots, ticket offices, passenger coaches, baggage, freight and express cars, cabooses, and other railway carriages, are also declared subjects of burglary.

The building entered in this case was the property of private individuals, though occupied by the public. That it was a "building," within the usual and ordinary meaning of the word, is perfectly clear. Are the books and records kept and deposited in it things of value? They are certainly so, and of very great value. The place where the crime is alleged to have been committed, then, falls clearly within the terms of the statute. If excluded, it must be by construction, only permissible where the spirit of the enactment is such that it can safely be said that it was not intended to be included by the legislature. We think the legislature intended to include buildings of other classes than those specifically mentioned. We are very clear that banks, offices, and buildings used for many other purposes, are within the protection of the statute if valuable things are kept in them. Churches were subject to burglary, even at common law. We perceive no good reason why the legislature should not and has not extended the same protection to public as to private property. The term "other buildings" has been held to include a saloon building. (*The State v. Comstock*, 20 Kas. 650); a granary (*The State v. Groning*, 33 id. 18); a buggy house (*The State v. Garrison*, 52 id. 180); a stable (*Orrell v. The People*, 94 Ill. 456); a railroad ticket office (*The People v. Young*, 65 Cal. 225); a railroad depot, under a statute passed before such a

thing was known in the state (*The State v. Bishop*, 51 Vt. 287). We think the objection to the information not well taken.

II. The challenges to jurors were properly overruled. While the very adroit examination of jurors by the counsel for defendant elicited answers to the effect that the jurors had formed opinions, based on the action of the justice of the peace in holding the defendant for trial and the information sworn to by the prosecuting attorney, on further examination by the court, it was made clear that the jurors had no settled opinions disqualifying them to sit in the case.

III. An application was made for a change of venue, on the ground of prejudice of the inhabitants of Harvey county against the defendant. In support of this application, a large number of affidavits were offered on the part of the defendant, tending to show many expressions of opinion against the defendant. On the other hand, a very large number of affidavits was offered by the state, tending to show that expressions of belief in the guilt of the defendant were not general. The case, as presented to us, is one of a disputed fact, namely, whether or not the people of Harvey county were generally prejudiced against the defendant. On the evidence before us, perhaps the trial court might with propriety have granted a change of venue. Possibly the expense to the county might not have been greatly increased by so doing, and a trial in another county might possibly have been preferable. We cannot say, however, that the court erred in its conclusions. The commission of any grave crime invariably attracts the attention of, and excites comments from, the citizens. Crimes are prosecuted by the state because they are offenses against the whole public, and the whole public is always interested in the punishment of violators of the criminal code. It does not follow, however, that there is any tendency or disposition to punish the innocent. The fact that the crime was charged to have been committed against public property does not necessarily prejudice the defendant, and is not of itself ground for a change of venue. (*The State v. Read*, 49 Iowa, 85; *Phillips*

*v. The State,* 29 Ga. 105; *Commonwealth v. Delamater,* 145 Pa. St. 210.)

IV. The fourth assignment of error is with reference to the introduction and rejection of testimony. In order to understand the questions presented, it is necessary to give a summary of the principal evidence offered at the trial. It was not claimed that Rogers was personally present at the time the register's office was broken into and the records burned. The theory of the prosecution was that Rogers, who owned a set of abstracts of the records in the register's office, procured his codefendant, George H. Shirley, to employ others to do the deed. Rogers alone was on trial in this case. The state first offered evidence showing that a burglary had been committed by breaking into the building occupied as a courthouse; that a hole had been made through the wall into the vault in which the records were kept; that the record books were pulled down and piled on the floor of the vault, saturated with kerosene oil, set on fire, some of the books wholly consumed, and others more or less injured.

J. B. Smith, called by the state, testified that he was a barkeeper for Clark Fierce, who kept a joint in the second story of a building belonging to the defendant, Rogers. On the same floor of this building was a bedroom occupied by Shirley. The regular hours of work of the witness were from 3 o'clock in the afternoon till 12 o'clock at night. The records were burned on the night of March 23, 1893. The witness testified that, by direction of Shirley, he quit work at 11 o'clock on the nights of the 22d and 23d of March, leaving the room in charge of Shirley; that he had never before, or after that time, been discharged from his duties before the regular hour; that he returned to the joint about 7 or half past 7 in the morning; that he went upstairs and found the door locked, then went to Tyson's restaurant, got the key from Clark Fierce, and went up into the joint; that he there found on the table some hop-tea bottles, scraps of bologna, and a sack of sandwiches in a sitting room, front of and connected with the room in which the joint was kept. The wit-

ness further testified, that during the few days prior to the 23d he had noticed three strange men around there, whom he described. The bedroom occupied by Shirley had a door opening into the sitting room.

One Thomas E. Carroll was then called as a witness, and testified that he came to Newton about the 10th or 12th of March, in company with one James Martin; that he went to the house of Joe Miller, where he found Mrs. Miller and Shirley; that he asked for Mr. Miller, and was told by Shirley that he was not at home; that, as they started away, Shirley came out and they made an appointment to meet at the Clark hotel that evening; that they did meet, and had a conversation, which ended by making an appointment to meet the next evening; that they then met according to appointment, and that the witness, Martin, and Shirley went to Shirley's office; that Shirley there told them that he wanted them to go to the courthouse, break into the register's office, take the books off the shelves, pile them on the floor, pour coal oil on them, turn the gas on, and touch it off with a match; that he was authorized to pay $500 for the job; that Shirley then gave them $5 each. He stated that on Sunday evening they again met, in front of Tyson's restaurant, and agreed to go from there to the joint, Shirley saying that if the bartender was there he would send him home; that they went into the joint, had a bottle of whisky, and talked the matter over; that Martin had been up to the place, looked it over, and discovered some one living in the adjoining building, and said the job was worth $1,000 or $1,500; that Shirley would not consent to pay any more; and said, "You don't want to let the lives of two or three people stand in the way of $400 or $500;" that Shirley provided a bottle of coal oil and a gun, and wanted them to wait until 2 o'clock; that they then went around in front of Stager's restaurant, where he met a fellow he knew whom he let into the secret; that this fellow was a friend of himself and Martin, and wanted to make some money, and he thought he would let him in on the job; that after parleying between the three of them, Martin de-

44—54 KAS.

cided not to have anything to do with it that night; that they took the coal oil down the railroad track toward the round-house, and hid it under some ties; that he left Newton on the following day, about 3 or 4 o'clock in the afternoon.

On cross-examination, this witness testified that his business was that of a gambler; that he had also done a little "boosting" (stealing); that he was a thief; that Martin (also called "Riley" by the witness), was a shoplifter; that the witness had done some "plugging" for Martin. In explanation, he said that Martin was a shoplifter, and he had disposed of some of his goods. For the purpose of corroborating this witness, it was shown by two boys that they found bottles of coal oil under a pile of railroad ties, and took them to a junk man to sell. G. O. Smith testified that he was a clerk in the restaurant of Mr. Matthews, in the Rogers building on the lower floor, under the joint before mentioned; that he went to work at 7 o'clock on the night of the fire and quit at 7 the next morning; that he saw Shirley on that night, first, at about 1 o'clock in the morning, in the restaurant; that he got a lunch consisting of pie, sandwiches, meat, and took it away with him; that he came into the restaurant again about 4 o'clock, and was out and in quite a number of times, and acted restless and excited; that he pulled out a large roll of bills, which he said was $400, which he said he had made that night gambling; that at one time he came in, and went through the room "on a kind of a tiptoe, double-quick run; then he came back and went upstairs;" that that was about 4 o'clock in the morning; that about 5 o'clock the witness went upstairs and got a bill changed, and there saw Clark Fierce, and Shirley also; that Shirley was stooping over a trunk as though in the act of packing something; that witness heard of the fire between half past 5 and 6 o'clock. The janitor testified that he went to the courthouse about 6 o'clock, opened the front door, discovered the fire, got a bucket of water, threw it on the fire, and then went and called the sheriff. William Fleming, a brakeman, testified that he went to the joint kept by Fierce,

between 5 and 6 o'clock on the morning of the fire, and there saw Shirley and Fierce, and learned of the fire; that he went for the purpose of borrowing some money of Shirley; that Shirley appeared to be intoxicated or excited.

Edward Harris was then called by the state, and testified that he came to Newton from Wichita, furnished by a man named Edwards with a little paper star, by which he was told Shirley would recognize him; went into a joint over a restaurant, where he found several people, Shirley among them; that he introduced himself to Shirley through the star; that they had a talk in the room in front of the barroom, after the saloon was closed, about 12 o'clock; that Shirley then told him and Edwards that he wanted them to burn the county records. This witness then detailed at length the negotiations between himself and two other men, whom he names as English and Ripple, with Shirley, with reference to the destruction of the records, their final agreement, and the manner in which the work was accomplished. The witness testified that he stood guard at the corner of the building while the other two men did the work; that after it was accomplished they went back to Shirley's; that he then gave them $50 apiece, and agreed to meet them behind Fahy's saloon, in Wichita, and pay them $150 more, the balance of the agreed price for the work; that when they went back to Shirley's, they had a kind of lunch, of sandwiches and canned stuff; that Shirley afterward met them, in Wichita, and paid the balance, as agreed. On cross-examination, this witness testified that he was also known by the name of Mickey Slade; that he had been frequently arrested for petty crimes, and that he was promised immunity from prosecution if he would testify to the facts within his knowledge in this case.

One H. W. Black was then called as a witness, and testified that he had lived in Wichita for 23 years, and had known George H. Shirley between 9 and 10 years; that Shirley had been his tenant; that in February, 1893, Shirley lived in one of the witness's houses in Wichita; that on one Sunday witness went to see Shirley about borrowing some money from

him; that in the course of the conversation Shirley said that he wanted some dirty work done, and wanted to know of the witness if he knew of anyone he could get to do a dirty job. Sometime in April, and after the records were burned, the witness was again at Shirley's house, and had a conversation with him, in which he stated that Shirley said: "I do n't know whether I will be prepared to let you have it or not. Mr. Rogers, my partner, objects to loaning any money out of Harvey county;" but he says, "Doc., I guess I will let you have it before a great while out of my own, whether he objects or not." The witness further testified: "I says, 'George, did you ever find your men to get that work done you spoke of?' he says, 'Yes, I got my men, and the work is done, and the records of Harvey county is burned, and we have the only abstract books of that county.' He says, 'By God, Doc., by God, we have got something equal to a gold mine. Yes,' he says, 'better; a gold mine might play out, and this never will.'"

The witness Carroll testified with reference to a conversation with Shirley after this prosecution was commenced: "He said if I would go to old Mexico and write him a letter from there, he would send me $500." He also testified: "He asked me what I intended to do in the case. I told him that I did not know; that Martin wanted to do what was right by him, but I heard that Martin had told him he wrote several letters to Shirley, and Shirley wrote him back an insulting reply, and he had decided to take the stand against him, and testify against him."

R. H. Judkins, sheriff of Harvey county, was called, and asked whether he had a warrant for Shirley's arrest. An objection to this question was sustained. The witness was then asked: "Do you know where George H. Shirley is now?" This was objected to, but the objection was overruled, and the witness answered, "I do not." The other testimony offered by the state bears mainly on the relations of the defendants Rogers and Shirley, and on Rogers's statements and interest in the destruction of the records.

On the part of the defendant, Clark Fierce was called, and testified that he ran a business in a room on the second floor of the Rogers building; that he stayed at home on the night of the 23d of March; that he got up at half past 5, came down town and went to Tyson's restaurant, drank a cup of coffee, then went to his place of business; that he got the key to unlock it, as had been his custom, at Tyson's restaurant; that Mr. Shirley was then in bed in the front room, where he usually slept; that he stayed there about an hour for the purpose of waiting on customers coming in on the morning trains, then locked up and went to his breakfast; that he did not see J. B. Smith there that morning before going to his breakfast, and that G. O. Smith did not come in that morning to get a bill changed, and that he did not see Fleming there that morning. Objections were duly made to the testimony, as to the declarations and admissions of the persons alleged to have been co-conspirators with the defendant, made both before and after the commission of the crime. An objection was also made to all the testimony about what took place between Shirley, Carroll, and his fellows, because it appeared that they abandoned the project and did not commit the crime. Much of the testimony with reference to the doings and sayings of the alleged conspirators was admitted in advance of any proof tending to connect the defendant, Rogers, with the crime. This also is alleged as error.

It has sometimes been said that proof establishing the conspiracy must precede proof of the acts and declarations of a co-conspirator. It is now well settled, however, that the order of proof rests largely within the sound discretion of the trial judge. It often happens that the conspiracy itself can only be proven by circumstances, and if it is established by the whole evidence in the case, a conviction will not be set aside merely because of the order in which the testimony is presented. (Whar. Cr. Ev., § 698a; The State v. Winner, 17 Kas. 298; Place v. Minster, 65 N. Y. 89; Rice, Ev., § 581.) We think the evidence of the negotiations of Shirley with Carroll and others with reference to the perpetration of the

crime was competent to prove the guilt of Shirley, as were also his inquiries for fit persons for such an undertaking. If a conspiracy already existed between Shirley and Rogers, by which Shirley undertook to find men who would actually perpetrate the crime for money, all his acts in seeking instruments were done in pursuance of the conspiracy, and might properly be proven.

We now come to the most serious question in this case. The sheriff, over objection, was permitted to testify that he did not know where George H. Shirley then was. This could only have been offered for the purpose of showing that Shirley had fled, and must have been so understood by the jury. If the sheriff did not know where he was, and there was no counter proof, the presumption would be that he was not where he could readily be found. The witness Carroll was permitted to state that Shirley told him, after the prosecution was commenced, that if he would go to old Mexico and write him a letter from there, he would give him $500. But the most damaging testimony of that class was that of the witness Black, concerning his conversation with Shirley at his home in Wichita, after the records were burned. The statements testified to were not only an admission of Shirley's own guilt, but tended strongly to connect Rogers with the crime. In Wharton's Criminal Evidence, § 699, it is said:

"When, however, the common enterprise is at an end, whether by accomplishment or abandonment, no one of the conspirators is permitted, by any subsequent act or declararation of his own, to affect the others. His confession, therefore, subsequently made, even though by the plea of guilty, is not admissible in evidence as such against any but himself. Even the most solemn admission, made by him after the conspiracy is at an end, is not evidence against his accomplices. Nor can the flight of one conspirator after such time be put in evidence against the others."

That the declarations or admissions of one conspirator, made after the full accomplishment and termination of the criminal design, cannot be introduced against a co-conspirator,

even for the purpose of proving the guilt of the party making the admission, has been fully recognized and declared by this court in several cases.    In the case of *The State v. Johnson*, 40 Kas. 266, Mr. Justice JOHNSTON, in delivering the opinion of the court, said:

"To make the declarations of one conspirator evidence against the others, they must be made in furtherance of the common criminal design.   .   .   .   When the conspiracy has ended, or the crime involving conspiracy has been consummated, the admission of one, in the absence of the other conspirators, that he and others participated in the crime, is a mere narrative of a past occurrence, and can affect only the one who makes it." (See, also, *The State v. Bogue*, 52 Kas. 79; *The State v. Patterson*, 52 id. 335.)

It is not seriously contended by counsel for the state that this evidence was admissible, but it is urged that the error is unimportant, because there was an abundance of competent evidence to show Shirley's guilt.   This is true; but can we assume that the statements of Harris, a confessed criminal, guilty according to his own statements of active participation in the perpetration of this crime, were true?   Can we assume that the jury gave credit to the testimony of one, or of a number of witnesses, rather than to another?   By what process of reasoning can we reach the conclusion that the conviction of the defendant is really based on the competent testimony rather than the incompetent?   Would not the fact of Shirley's absence, shown by the testimony of the sheriff and the testimony of Black, (who, so far as the record discloses, was a reputable witness,) as to the conversation with Shirley, in which he confessed the crime, and boasted of the value of the abstract books, be likely to have as much weight with the jury as any other testimony in the case?   Much of the testimony as to what took place at the joint in the Rogers building was contradicted by Clark Fierce, a witness for the defendant.   We cannot say how much of the testimony of the prosecution on these matters was given credit, or how much was disbelieved.   It is always the province of the jury

to scrutinize the witnesses, to observe their manner of testifying, and to determine how much credit is to be given to each, and it is especially so where confessed accomplices and persons of bad character are placed on the witness stand.

The court, in charging the jury, instructed them that the testimony as to admissions made after the consummation of the crime could only be considered in determining the guilt of Shirley, and that the declarations of Shirley and others could not be considered for the purpose of determining whether Rogers was a party to the conspiracy or not. If Shirley had been on trial also, the testimony as to his confessions would have been competent as against him, and the instructions of the court limiting the application of the testimony to the case against Shirley would have been proper. But Shirley was not on trial, and all of these confessions were therefore improperly received in the first instance, and the instructions of the court did not go to the extent of wholly excluding them from the consideration of the jury. The error in its admission, therefore, cannot be said to have been cured by the instructions of the court. The statements made in April by Shirley to Black were highly prejudicial to Rogers, if true. The instruction of the court, that the jury should not consider them as evidence tending to connect Rogers with the conspiracy, could hardly have wholly effaced the effect on the minds of the jurors that the declarations from the lips of the witnesses must have had at the time. The jury were still left with the erroneous instruction that all of these admissions might be considered for the purpose of determining the guilt of Shirley. The danger of allowing such admissions to be considered in evidence will be more fully appreciated when it is perceived that, if the confessions of Shirley, after the crime, are competent evidence to prove his guilt, so also would be the confessions of Harris, English, and Ripple, who, according to the statements of Harris, actually perpetrated the crime, as to their connection with the offense. Would it be contended that, if Harris had narrated to another witness all of the mat-

ters disclosed in his testimony in this case, that that witness might have been placed on the stand for the purpose of testifying to them?

It is apparent from the very long record brought to this court that this trial was long, and very expensive to the county.  It is extremely unfortunate that error should be found in the record; but every man charged with crime may at his trial insist on the observance of every rule of law designed for the protection of the innocent.  To countenance a disregard of any important rule of law is to introduce confusion, and open the door to injustice.  We perceive no other substantial error in the record; but, for the admission of the incompetent testimony above referred to, the judgment must be reversed.

HORTON, C. J., concurring.

JOHNSTON, J., dissenting: The principal objections that were urged against the conviction of Rogers have not been sustained, and I am unable to concur in the conclusion that prejudicial error was committed in the admission of testimony. It appears to me that the testimony held to be objectionable is not very material, since the proof showing Shirley's guilt was overwhelming.  In fact, there seems to have been but little effort made to shield him from the charge alleged by the state.  The statement by the sheriff, that he did not know where Shirley was at the time of trial, is of little consequence, and to show that the court was guarding against any prejudice, it appears that testimony offered to the effect that he had fled from justice and had forfeited his bond was excluded from the jury.

The testimony of the declarations and admissions of Shirley, after the conspiracy had ended and the crime had been consummated, was only competent for the purpose of showing the participation of Shirley in the criminal act.  According to the theory of the state, Shirley was the principal actor in the conspiracy, and to establish the conspiracy, it was necessary to show the part he took in the crime.  The declara-

tions or admissions which he may have made were competent for that purpose. (*The State v. Johnson*, 40 Kas. 266.) In this case, as in all others where the guilt of several persons is involved in the charge, it is the duty of the court in its instructions to limit the application of the testimony to the one who made the declaration or admission. (*The State v. Johnson*, supra.) That was done in the present case. The jury were first instructed to disregard the evidence of all statements or admissions made by Shirley in the absence of the defendant, and to consider only such as would tend to prove the conspiracy. As to the evidence of the witness Carroll, the jury were told that it was only received to prove that Shirley had committed, or caused the offense to be committed, and must not be considered in determining whether Rogers had any connection with the transaction, or was a party to the conspiracy. As to the testimony of Black, the jury were advised that this testimony was only received to show that Shirley committed, or caused to be committed, the offense charged, and not to prove that there was a conspiracy or agreement to destroy the records, to which Rogers was a party; and, further, that the testimony of Carroll, Harris, and Black, with reference to the part taken by Shirley, could not be considered by the jury in determining whether or not Rogers had any connection with the offense charged against him.

In view of the care and discrimination of the court in charging the jury with reference to the effect of this testimony, it is my opinion that no prejudicial error was committed. On an appeal, judgment should be given without regard to technical errors or defects, or to exceptions which do not affect the substantial rights of the parties. (Crim. Code, § 293.)