No. 23,400.

The State of Kansas, *Appellee*, v. Ray Goyens, *Appellant*.

SYLLABUS BY THE COURT.

Criminal Law—*Evidence—Declarations of Coconspirators—When Inadmissible.* On the separate trial of one charged jointly with others with the crime of grand larceny, the rule approved in *The State v. Johnson,* 40 Kan. 266, 19 Pac. 749, and other cases cited in the opinion, is followed, and *held,* error to admit evidence of declarations of one of the alleged conspirators in the absence of defendant for the reason that the declarations were not made in the furtherance of the common, criminal design and were made after the conspiracy had been consummated.

Appeal from Kingman district court; George L. Hay, judge. Opinion filed February 11, 1922. Reversed.

*William Barrett, George Barrett,* both of Pratt, and *S. S. Alexander,* of Kingman, for the appellant.

*Richard J. Hopkins,* attorney-general, *Charles C. Calkin,* county attorney, *Carr W. Taylor,* and *John H. Connaughton,* both of Hutchinson, for the appellee.

The opinion of the court was delivered by

Porter, J.: Ray Goyens appeals from a judgment convicting him of grand larceny. He was charged jointly with Martin Ratcliff and another defendant with stealing a Ford car. Martin Rat-

cliff entered a plea of guilty; the other defendant is a fugitive from justice.

. The defendant is a farmer and lives in Pratt county. Martin Ratcliff had worked for him at different times for several years prior to the war, and after returning from the war, and when not working, had made his home at defendant's place. On the night of September 10, 1920, Martin Ratcliff went to Kingman and stole a car which belonged to his half brother, Earl Ratcliff, and drove it a distance of eighteen miles through Kingman county into Pratt county to the home of the defendant. He got to Ray Goyens' place at two o'clock Sunday morning. He left the car a half mile west of the house in a low place in the cornfield. Martin Ratcliff was the main witness for the state. His testimony as to what occurred when he got to Ray Goyens' house is in substance as follows: "I told Ray that I had a car out there; he didn't say much of anything; said all right or something; I don't know just what he did say. I told him I wanted the car worked over that morning, that there was a man uptown that was going to work it over. Later on I told him I wanted to get a man and told him who to bring out. I had run out of gasoline. Goyens went to town about eight o'clock and got back about ten; I drove the disc while he was gone. He came out in the field where the car was and he says, 'I have brought your man and the gas.' Then I drove over to where this other car was. There was not anything particular said. I took the covers off the car and threw them in Ray's car. I was out at the car about an hour. I took the numbers off the car. Ray. Goyens was sitting in his car with Johnnie Rouse about fifty yards away, maybe twenty-five yards away. After taking the numbers off I went back to disking. There was nothing said there as to where I got this car nor as to what I was going to do with it. The next conversation I had with Ray about the car, I think was Sunday night, about two o'clock in the morning. The sheriff, Mr. Fisher, and Earl Ratcliff [Martin's half brother] came to Goyen's house. I had a conversation with Ray before I left the house; he said somebody wanted me; said he didn't know who it was. Ray did not tell me what to do or what to say. I talked to the sheriff and Earl Ratcliff about thirty minutes; they were looking for Earl's car. I told them I had not seen it. After the sheriff went away, Goyens came out in the yard and asked what they wanted. I told him and he asked me what I was going to do about it and I told him I was going to move

it. Ray did not ask that I should take the car away. I wanted him to let me have his car to take it away. He did not want me to have his car. I told him I would have to take it anyhow. He said he did not want me to take his car away. I wanted to take another fellow along in his car and he didn't want me to use it and I told him I would have to. I don't know what reason he gave for not wanting me to take his car. I don't think he wanted to be seen in my company."

He took defendant's car and Slatterly went with him and drove the stolen car; they hid it in a field about four miles away, in a sort of a "draw." After he got back, Ray wanted to know what was done with it and Ratcliff told him. Ratcliff testified that after his return he "went out to the barn and harnessed up a team and hitched them to a disk and disked out the tracks where the car had been." Ratcliff and Slatterly helped hitch the team. The only disking done that day was where this car had been driven in the field and out. He testified that several days afterwards in company with Goyens he took Ray's car and the latter went with him along the road where the stolen car was and he asked Ray if he could see the car from the road, and he said he could not. On the Saturday following he met Ray at Cunningham and told him that he was going to get the car out of the Preston pasture that afternoon and take it out West. He borrowed the use of Ray's car again. The stolen car was driven to Colorado, where Ratcliff was arrested and brought back. He was sentenced to the reformatory at Hutchinson for stealing the car and came from there to testify.

Slatterly, the young hired man, eighteen years old, testified to assisting in taking the car to the Preston pasture; they got back to Ray's place about sun up; that when they returned Ray Goyens "wanted to know if we got rid of it and we told him we did and he said 'good' "; that Ratcliff then harnessed the horses and Martin and Goyens went down to the field and they disked out those tracks that the car had made when they drove out of the field.

The sheriff procured a search warrant and found the seat covers of the stolen car and an inner tube which belonged with it under the hay in Goyens' barn; the jack belonging to the stolen car was found in his garage.

The defendant testified that he is a farmer and owns a half section of land which he had lived on for fifteen years; he had known Martin Ratcliff all his life; after Ratcliff had came back from the

war he stayed at defendant's place most of the time. He had not seen Ratcliff for three or four days before the car was brought to his place; when Ratcliff came there on that morning he told defendant he had a car out there on the road and that he had run out of gasoline; defendant went to Cunningham to get some repairs that he needed for himself, and got the gasoline and brought Rouse out with him; he heard none of the conversation between Rouse and Martin. He asked Martin about the car and Martin said he was making money easier selling whisky than if he worked for it; that he was selling booze out of the car; afterwards Martin said the officers were getting after him and that he was afraid to sell whisky off the car and that he would have to move it. After the sheriff had talked with Martin that night and had gone away, defendant said to Martin, "Is that Earl Ratcliff's car?" He had heard that it had been stolen and he was afraid that it might be. Martin replied, "No, it was a car he was using for a whisky car and he had got it in Wichita." The defendant testified: "I told him I wanted him to get it away from there; that I did not want to have any trouble; I didn't care what he did with it just so he got it off of my place." His testimony is that the first time he saw the jack was when the officers had it; it was after night, in the dark, and he told the officer that it was his jack and thought it was because he had one like it. "On Sunday morning after the car was taken, I done some disking. I disked out the tracks. I supposed I was doing right. I didn't want to have any trouble myself and told them to get it out of there." He said that he had no knowledge that Martin Ratcliff was going to steal a car, had never at any time counseled with him about stealing one; and never aided, advised or encouraged him to steal a car in Kingman county, and had never heard of the car until it was brought to his place.

It is not claimed that Ray Goyens was present at the commission of the offense in Kingman county and no evidence was offered tending to show that. No affirmative testimony was offered showing that at any time before the car was stolen appellant counseled, aided or abetted in the commission of the offense, or that he had any connection with the car until it was brought to his place. The sheriff was a witness, and, over defendant's objection, was asked about a conversation with Martin Ratcliff in Colorado where Ratcliff was arrested with the car in his possession. The question was, What did Ratcliff say? The witness answered that "he said his

The State v. Goyens.

boss told him to drive this car out there." In answer to another question of the same kind, the witness testified that Ratcliff said he drove it out there for his "boss." This evidence was admitted over the defendant's objections and a motion to strike out was overruled. The first position taken by counsel for the state in their brief is: "There was nothing in the question or the answer to connect them with the defendant." It is said:

"Nowhere in the abstract do we find that Ratcliff referred to Goyens as his boss. In fact, he never did say who his boss was."

For some reason counsel for the state have failed to suggest what was the purpose of these questions. The proof showed that for several years Ratcliff had worked on the farm for the defendant, and this fact gives color to the theory of the defendant that the questions were asked and the answers relied upon for the purpose of connecting the defendant directly with the larceny of the car. But counsel for the state further say in the brief:

"If he had referred to Goyens as his boss, this evidence would still have been admissible for the reason that it appears from all the facts and circumstances that the conspiracy between these defendants was to steal an automobile and secrete it and avoid detection; that at the time of this conversation they were still engaged in the common purpose of stealing the automobile and taking it out of the country that they might secure the benefits of their theft and avoid detection. There is no question but what these parties were engaged in the common purpose of stealing this automobile and then to shield and protect themselves from discovery, prosecution and punishment therefor. Their common purpose did not end with the stealing of the automobile, as was shown by the evidence of their acts the night the car left the vicinity of Cunningham."

It is said that "evidence of this kind was upheld in the case of *The State v. Mullins,* 95 Kan. 280, where the prior authorities of this court were reviewed and commented upon." The Mullins case, however, does not sustain the contention of the state in the present case. Mullins was charged with being an accessory before the fact to the killing by Roberts of one King. Evidence of certain acts and declarations of Roberts after the homicide, and when the defendant was not present, was admitted. In the opinion it was said:

"That fact, the killing of King by Roberts, was a prime necessity in the state's case against Mullins. Over and over again the court ruled against the objections of defendant to this class of testimony, usually explaining his ruling that this evidence was only admissible to prove the killing of King by Roberts, and he repeatedly admonished the jury to consider it only for the

determination of that fact. This was also carefully covered by the final instructions to the jury. The twenty-sixth instruction will illustrate:

"'26. Certain alleged statements, acts and declarations of Paul Roberts after the time of the death of Anthony King and not made or done in the presence of the defendant Mullins were allowed to be testified to by witnesses in the case; this was permitted by the court for the purpose of enabling you to determine the question of the guilt or innocence of Paul Roberts only, and you will consider them for no other purpose.'" (p. 291.)

In the present case the court gave no instruction limiting the effect of the testimony of the statements of Martin Ratcliff to the sheriff. It was necessary to show that Ratcliff had stolen the car in Kingman county, just as it was necessary in the Mullins case to show the killing of King by Roberts. But the testimony of the statement and admissions by Ratcliff was not offered for any such purpose. There was no dispute over the fact that Ratcliff had stolen the car. The rule declared in the Mullins case is that the court was not required "to shut out all evidence after the murder which shows the sayings and doings of the one who did the killing, when that evidence is carefully restricted by clear and precise instructions to the jury that such evidence is only to be considered for the purpose of determining the guilt of the one who actually committed the deed." (Syl. ¶ 8.) In the present case, as we have seen, there was no occasion for introducing the testimony to establish the guilt of Ratcliff.

The case falls within the doctrine of *The State v. Bogue*, 52 Kan. 79, 34 Pac. 410, where it was held that evidence of declarations by the principal in the absence of the accessory before the fact was inadmissible. In the opinion it was said:

"We, of course, are not here considering declarations of co-conspirators, or of persons engaged in a common criminal enterprise before or during the perpetration of their crime, but declarations of one of two defendants, jointly charged as principals, made long after the offense, if any, was consummated. We are clearly of the opinion that the testimony was inadmissible." (p. 85.)

The Bogue case followed the case of *The State v. Johnson*, 40 Kan. 266, 19 Pac. 749, where Mr. Justice Johnston, speaking for the court, said in the opinion:

"To make the declarations of one conspirator evidence against the others, they must be made in furtherance of the common criminal design. . . . When the conspiracy . . . has been consummated, the admission of one, in the absence of the other conspirators, that he and others participated in the crime, is a mere narrative of a past occurrence, and can affect only the one who makes it." (p. 268.)

(See, also, *The State v. Rogers,* 54 Kan. 683, 39 Pac. 219.)

In the Rogers case it was urged that the error was unimportant because there was an abundance of competent evidence to sustain the guilt of the defendant. In the opinion it was said:

"Can we assume that the jury gave credit to the testimony of one or of a number of witnesses rather than to another? By what process of reasoning can we reach the conclusion that the conviction of the defendant is really based on the competent testimony rather than the incompetent?" (p. 695.)

In this case where the defendant's admissions would have been sufficient to convict him of receiving stolen property, or at least of concealing the theft of the car, it can hardly be said that the incompetent testimony may not have been prejudicial on the charge of being an accessory before the fact to the larceny of the car. He was entitled to a fair trial upon the charge against him. The evidence tending to show that he had aided, counseled or abetted Ratcliff in stealing the car was slight and circumstantial. In view of these facts we think the admission of the testimony was prejudicial error.

Error is claimed with respect to the instructions, particularly to a part of instruction No. 8 in which, after defining larceny, and stating when it begins and is completed, further charged "and continues as long as the taker exercises dominion or control over the property taken as against the true owner with the intent on the part of the taker to steal the same." It is claimed that the latter part of the instruction permitted counsel for the state to argue and the jury to find that even if Goyens had no connection with the taking in Kingman county, yet, after the car was in the possession of Martin Ratcliff in Pratt county and he exercised dominion and control over it, the larceny continued, that any act done in Pratt county to assist Ratcliff in getting away with the car would be aiding and abetting in the original taking and carrying away. We think the last part of the instruction was unnecessary but that it could not have prejudiced the defendant in view of the other instructions.

A careful examination of all the instructions shows that the rights of the defendant were carefully guarded. The jury were instructed that a person receiving stolen goods, whether he knows them to be stolen or not, cannot simply for receiving them be convicted of larceny; and that if the jury believed from the evidence that the defendant did not actively participate in the theft, and did not aid,

assist or abet the commission of the larceny, and that the taking of the automobile had been completed and fully consummated before the defendant had anything to do with it, he could not be convicted of grand larceny; and that this would be true even though the jury believed from the evidence that after the automobile was stolen the defendant received it into his possession and permitted it to be brought upon and remain upon his premises. They were charged that if they found from the evidence that the defendant knew the crime charged in this case had been committed and he failed to give information thereof, this alone would not make him guilty of larceny.

For error in the admission of incompetent testimony, the judgment is reversed and the cause remanded for another trial.