Givens v. State.

GIVENS v. STATE.

(*Knoxville*. December 6, 1899.)

1. INDICTMENT. *Sufficient, of accessory before the fact.*

An indictment of an accessory before the fact is not bad for failing to charge the killing of deceased, which avers that defendant procured the principal offender to kill and murder the deceased with certain guns and pistols, "by shooting her and killing her with said weapons," and then adds, "whereby, of the wounds and effects thereof" she "instantly then and there died." (*Post, pp. 651, 652.*)

2. SAME. *Certainty of averment.*

All requirements of certainty in the averments of an indictment are fully met where the indictment, upon a fair and reasonable construction of its language, as a whole, sufficiently informs the Court and the defendant of the nature of the offense to enable the Court to pronounce judgment, and to enable the defendant to make intelligent defense, and protect himself from a second prosecution for the same offense. (*Post, p. 652.*)

Code construed: §§ 7077, 7078 (S.); §§ 5943, 5944 (M. & V.); §§ 5114, 5115 (T. & S.).

3. TECHNICALITIES. *Not indulged by Courts.*

There is a strong and growing inclination of the Courts, repeatedly announced, to escape from the embarrassments of technicalities that are "empty and without reason, and tend to defeat law and right." (*Post, pp. 652, 653.*)

Cases cited and approved: Wallace v. State, 2 Lea, 35; State v. Staley, 3 Lea, 567; Glidewell v. State, 15 Lea, 135; Isham v. State, 1 Sneed, 111; Hale v. State, 1 Cold., 168; Wood v. State, 14 Lea, 461.

4. MURDER. *Verdict for, supported by facts.*

A verdict of murder in first degree, with death sentence for wife murder, is sustained upon the facts set out in the opinion. (*Post, pp. 654-660.*)

5. EVIDENCE. *Admissible under charge of accessory before the fact.*

On the trial of an accessory before the fact, it is essential to establish the guilt of the principal offender; and hence all evidence competent to prove or rebut his guilt, including his confessions. is admissible. (*Post, 660, 661.*)

Cases cited and approved: Self v. State, 6 Bax., 244; Morrow v. State, 14 Lea, 484.

6. SAME. . *Record of conviction of principal admissible on trial of accessory.*

The record of the conviction of the principal offender is competent and admissible on the trial of an accessory before the fact. It affords *prima facie* evidence of the principal's guilt. The entire record proper should be introduced and its effect confined to proof of the principal's guilt. (*Post, pp. 661, 662.*)

Cases cited and approved: Duncan v. Gibbs, 1 Yer., 255; Lewis v. Bullard, 3 Hum., 206; Willis v. Louderbach, 5 Lea, 561. .

7. CHARGE OF COURT. *Inadvertent use of wrong word not reversible, when.*

The use of the word "that" for "whether" in this sentence of the Court's charge, viz.: "If you find that D. did the slaying, you will find *that* it was unlawfully done," does not constitute reversible error where it is evident from the context and the whole body of the charge that it was a mere inadvertence and could not have misled the jury. (*Post, p. 662.*)

8. SAME. *Directions as to evidence applicable to different counts.*

It is not the duty of the Court, in its charge to the jury, on the trial of a defendant under an indictment containing several counts, to point out the specific parts of the evidence applicable to each count, but to state, in general terms, the rules by which the jury shall be governed in applying and considering the evidence. (*Post, pp. 662, 663.*)

9. SAME. *As to weight of confessions.*

It is proper for the Court to charge that confessions are to be weighed in the light of the facts and circumstances that surrounded the prisoner at the time they were made. (*Post, pp. 663, 664.*)

10. JURY. *Discharging juror in defendant's absence.*

It is not reversible error for the Court to discharge a juror before the jury had been sworn, upon discovering that he was

not a freeholder or householder, in the absence of defendant, where his counsel were present and made no objection. (*Post, p. 665.*)

11. SAME. *Expression that does not disqualify juror.*

A juror·is not disqualified to sit upon a jury in a case of wife-murder by having, without knowledge of facts, and wholly upon information obtained from rumor, made the statement that "if he (defendant) was guilty of murdering his wife, he deserved to be hung." (*Post, pp. 665, 666.*)

12. SAME. *Weight of judge's finding on question of juror's disqualification.*

Where a juror has denied making the disqualifying statement proved against him by a single witness, this Court will not disturb the trial Judge's finding in his favor. (*Post, p. 666.*)

13. SAME. *Objection propter defectum.*

Objection *propter defectum*—*e.g.*, that a juror was a minor—comes too late after verdict, even if not known to or discoverable by defendant at an earlier date. (*Post, p. 666.*)

Cases cited and approved: Draper *v.* State, 4 Bax., 246; McClure *v.* State, 1 Yer., 206; Gillespie *v.* State, 8 Yer., 507; Hamilton *v.* State, 101 Tenn., 418.

---

FROM JEFFERSON.

---

Appeal in error from Circuit Court of Jefferson County. W. R. HICKS, J.

W. F. PARK and W. J. McSWEEN for Givens.

ATTORNEY-GENERAL PICKLE for State.

BEARD, J. The plaintiff in error was, after indictment and trial, found guilty of the murder

of his wife. The indictment contained two counts. The first of these charged him with feloniously, willfully, deliberately, premeditatedly, and with malice aforethought committing murder in the first degree upon the body of his wife, Martha J. Givens. The second count charged that unlawfully, willfully, feloniously, premeditatedly, and of malice aforethought he counseled, commanded, hired, procured, and induced one John W. Dawn to kill and murder her.

A motion to quash this second count was made upon the ground that it failed to charge that Dawn, "in consequence of said hiring, commanding, procuring, etc., did in fact kill and murder the said Martha J. Givens."

This motion was overruled, and the action of the trial Judge in this regard is assigned as error.

We agree with the Court below in its holding. The count in question, after charging that plaintiff in error "unlawfully, willfully, deliberately, feloniously, premeditatedly, and of his malice aforethought did counsel, command, hire, procure, and induce one John W. Dawn, on the day and year aforesaid, in the State and county aforesaid, unlawfully, willfully, feloniously, deliberately, premeditatedly, and of his malice aforethought to kill and murder one Martha J. Givens, with certain guns and pistols, by shooting her and killing" her "with said weapons," then adds: "Whereby

of the wounds and effects thereof" she "instantly then and there died."

The rule is that the statement of the offense should be sufficiently certain to notify the defendant and the Court of the nature of the crime charged, and to enable the defendant to plead any judgment which may be rendered in the case as a bar to subsequent prosecution for the same offense.

We think this count answers the requirements of this rule. A fair and reasonable construction of its language gave notice to the defendant that he was charged with hiring Dawn to murder Mrs. Givens, and that as a result of this hiring she was murdered by him. It is true apter words might have been used to express the latter part of the charge, but to hold, as it is now insisted, that they fail to aver murder by Dawn as the result of the previous procurement by the defendant, would be not only to violate the ordinary rules for the construction of language, but also to run counter to the will of the Legislature, as expressed in the Code (Shannon's, Sections 7077, 7078), and the growing inclination of this Court, repeatedly announced, to escape from the embarrassment of technicalities that are "empty and without reason, and tend to defeat law and right." *Wallace* v. *State*, 2 Lea, 35; *State* v. *Staley*, 3 Lea, 567; *Glidewell* v. *State*, 15 Lea,

135; *Isham* v. *State,* 1 Sneed, 111; *Hale* v. *State,* 1 Cold., 168; *Wood* v. *State,* 14 Lea, 461.

This assignment is therefore overruled.

Having disposed of this preliminary question, it is proper, in view of the contention that the evidence does not support the verdict, to state the facts found in the record, upon which rests the conviction of the plaintiff in error of murder in the first degree under the first count in the indictment.

The theory of the State was and is that plaintiff in error had become greatly infatuated with one Sarah Jane Worsham, with whom he had sustained criminal relations up to a short time before she left the neighborhood of the home of the plaintiff in error to join her husband in another State, and this infatuation led him to take steps to have his wife murdered; that in order to accomplish this he employed one Dawn, a young nephew of his, who had been partially raised by him and who was under his domination, to perpetrate the act; that on the night of the homicide he induced his wife to seat herself in front of an uncurtained window, where the upper part of her body ·was exposed to the view of Dawn, who was on the outside of the house, and who, with a gun that had been examined by the plaintiff in error and prepared by him for the deed, fired the fatal shot. The State further insists that in order to divert sus-

picion from himself, plaintiff in error took a seat near his wife, but out of range of the assassin's gun, and protected from it by the jamb of the window, and was sitting there under the pretense of reading a newspaper when the shot which killed her was fired by Dawn.

The facts to support this theory are numerous, and, it is insisted by the State, place its truth beyond all reasonable doubt.

That the plaintiff in error had sustained criminally intimate relations with Mrs. Worsham is confessed by him. Five letters which he admits were from him to her are in the record. These letters were evidently written to and received by her a short time before she left that neighborhood, with a view of rejoining her husband, and when, it would seem, for some reason, she had broken off, or was about to break off, her relations with Givens. They indicate his infatuation for this woman and a state of mind bordering on frenzy because of her change of demeanor to him and his anticipated separation from her. They are full of crude and extravagant expressions of love for her, reproaches for her late coldness to him, and protestations that life without her would be intolerable.

The fact of his attachment to Mrs. Worsham and their exchange of notes and letters, as shown by the record, had come to the knowledge of Mrs. Givens, resulting in great distress of

mind to her. The husband and wife had disagreements growing out of this knowledge, which, at least on his part, were angry and exasperating. To a witness who was sent for at the time of one these disagreements, and who found Mrs. Givens in tears, the plaintiff in error said: "People that she (his wife) talked about were as good as she." Another witness, who worked for and with Givens, testified that the latter and his wife had trouble about this woman, and when, on one occasion in her grief she was seeking to dissuade him from visiting this woman, he had heard Givens tell her he would go and do as he pleased. To this witness Givens made a proposition looking to the killing of the husband of Mrs. Worsham, and at the same time he talked of going off with her. To still another witness, who was working with him, he told a story of a man in North Carolina who hired another to kill his wife, and he (Givens) asked the witness if he knew of any method by which they could get his wife out of the way, and said if it could be done, then he and witness would go to Knoxville and have a good time with whisky and women.

This is a sufficient reference to the record to show both motive and purpose.

Mrs. Givens was killed about 7:15 o'clock of the evening of the 18th or 19th of April, 1896. It is a matter worthy of notice that Mrs. Wor-

sham had left for Indiana or Illinois only a
short time before—according to one of the wit-
nesses, about the 1st of that April. In the late after-
noon preceding the killing, Dawn was observed
going down to a pasture not very far from
Givens' house. Givens had arranged with the
owner for the pasturage of his horse there for a few
days. Dawn was seen by at least one witness
in this pasture. He went down on foot, and in
a little while, and not long before sundown, he
was followed by Givens on horseback. About dusk
Givens was observed coming back and going in
the direction of his home, and later Dawn also
returned. Dawn stopped at the house of a neigh-
bor for a short time, picking a banjo, and then
laid it down, saying he was going across the
river to see his sweetheart, but instead went
toward the home of Givens. Within a few min-
utes thereafter the little village was alarmed by
the loud report of a gun, followed soon by cries
of lamentation coming from Givens. Neighbors at
once gathered, and they found the body of Mrs.
Givens lying on the floor, the head, neck, and
other upper portions of the body perforated with
shot or balls, from the effect of which she in-
stantly died. The plaintiff in error, as were his
young children, was indulging in expressions of
grief. When asked by his neighbors how the kill-
ing occurred, he said that just before the shoot-
ing his wife had taken her seat at the sewing

machine, which stood in front of the window, to do some sewing for him; that in order to shade her eyes from the light of the lamp, which stood on it, he had placed his hat on her head, and that he then sat down at the end of the sewing machine, and was engaged in reading a Sunday school paper, when he was astounded by the report of the gun, followed by the fall of his wife's body to the floor. He added that he thought that the shot was intended for him, and that as his wife had on his hat, the assassin had mistakenly fired at her for him.

The weapon with which the killing was done was fired from the outside; the shot or balls in entering broke one or more panes of glass, and the sash was powder burnt, this last fact indicating that the murderer stood only a short distance from Mrs. Givens, who sat just on the inside of the window. In addition, the window curtains were up, or pulled back, and there was no obstruction of the view and no reason why there should be any mistake as to the identity of Mrs. Givens.

The record is full of evidence as to the excellency of the character of Mrs. Givens. Her neighbors regarded her as a Christian woman, and no suggestion is made of a motive for her murder save as found in the theory of the State.

Soon after the gathering of the neighbors, a search was made for signs of the murderer. In

an old kitchen or outhouse on Givens' place was found a gun. On being examined it was discovered that one of the barrels had been recently fired. It was a breech-loading gun. When broken, it was found that there was an empty shell in one barrel. At least two of the witnesses, upon placing this barrel to the face, discovered, as they thought, that it was still warm, as from a recent shot. Upon putting a finger into the muzzle, powder stains were made upon it. After this examination, one or more witnesses said: "This is the gun that did the killing;" and Givens, who was in the group making the search, said: "No, I reckon not; that is an old gun, which will not fire." Later, however, he said when speaking as he did he thought it was his son Carl's old gun; that he did not know that this gun (the one fired) was on the place. Subsequently it developed that this was a gun belonging to another party, which Dawn some time before had brought over to Givens' place.

During the evening Carl, the young son of plaintiff in error, in his grief, said: "No one killed mamma but old West Dawn." To this the father replied: "Hush, Carl; I do not believe Wessie did any such thing." Why Carl suspected Dawn of the killing does not appear, but that he did do so is as certain on this record as is the fact that Dawn did fire the fatal shot; and why the

father should thus deny the charge of the son, we think, in the light of the evidence, cannot be explained save on the idea that he sought to divert suspicion from Dawn, feeling that his own safety depended on doing this successfully.

The next day was Sunday, and the inquest was then held. The result of this inquest gave plaintiff in error great concern. One of the witnesses (Mims) testified that after the inquest the plaintiff in error asked him what the finding of the jury was, and if he (Givens) was in any way implicated by it, and, in reply, the witness referred him to the Coroner, who was then writing the finding of the jury. Two witnesses say they heard Givens, during the day, say to Dawn: "Die with the tale in your mouth," and another says that after the inquest he was sitting with Dawn and Givens, when the former said to Givens: "You do not believe I killed Aunt Mattie, do you?" and Givens replied: "No, Wessie, I cannot believe it. Tell the same straight tale about it and you will come out all right." Dawn was then under arrest, and this admonition was given about the time the officer was taking him away. A little later in the day Givens was arrested.

After his arrest Dawn made several confessions, in which he admitted he killed his aunt, and gave the details of the preparation for and perpetration of the murder. In these he implicated

his uncle and said the murder was committed with reluctance by him, and only upon the pressing importunity of the plaintiff in error. One of these was made to a newspaper reporter in Knoxville a day or two after the murder, and in the immediate presence of Givens. Instead of denying the statements of Dawn and denouncing them as false, as would have been done by an innocent man, he simply said, "Why, Wessie, I don't see how you can tell such a tale on me!"

It is unnecessary to pursue with further detail the testimony, as we think it establishes beyond all reasonable doubt that plaintiff in error procured the shooting; that he had Mrs. Givens sit at her sewing machine with a lighted lamp on it throwing full light upon her, and that he was present near her, but in a position where he was personally safe, when the gun was fired. On the record the jury were fully warranted in finding that plaintiff in error was guilty of murder in the first degree under the first count of the indictment.

Many errors are assigned upon the action of the lower Court in admitting or excluding testimony. Of these errors the larger and altogether the greatest number are predicated upon the idea that the second count in the indictment, charging Givens with being an accessory before the fact, was not good, and should have been quashed. Having, however, held that this count was good,

these objections are necessarily removed. For all the testimony which would have been competent to show Dawn, as principal, guilty of murder, if he had been on trial, was equally competent against Givens, thus charged as being accessory before the fact. Dawn, the principal, had already been tried and convicted. In such a case the rule is well settled that when afterwards the accessory before the fact is put on trial the proceedings are to be conducted as if the principal was again on trial, and the case against the accessory will not be gone into until the case against the principal is established. *Self* v. *State,* 6 Bax., 244.

Under this rule confessions of Dawn, though not made in the presence of Givens, under the second count were competent, not to fix guilt on plaintiff in error, but to show the guilt of Dawn and the grade of his offense. *Self* v. *State, supra; Morrow* v. *State,* 14 Lea, 484; Wharton's Crim. Ev., Sec. 702; 2 Bishop on Crim. Procedure, Sec. 13.

The record of Dawn's conviction was also competent under the second count, as *prima facie* evidence of his guilt (Whar. Crim. Ev., Sec. 602; 2 Bish. Crim. Pro., Sec. 12), and being competent it was the duty of the State to introduce the whole. *Duncan* v. *Gibbs,* 1 Yer., 255; *Lewis* v. *Bullard,* 3 Hum., 206; *Willis* v. *Louderbach,* 5 Lea, 561.

In regard to all this class of testimony the State distinctly and properly announced that it was not to be considered by the jury, save in connection with the question of Givens' guilt under the second count.

But even if any errors were committed in these matters, yet as the conviction of plaintiff in error on the first count was equivalent to an acquittal under the second count, they would not now be considered, under the rule in *Deberry* v. *State,* 99 Tenn., 207.

Other assignments of error upon the action of the trial Judge in admitting or excluding testimony, outside the class which have just been considered, are disposed of orally as not being deemed sufficiently important to be embraced in this written opinion.

A number of errors are assigned on the charge of the trial Judge. It is said he assumed the province of the jury in the following clause: "If you find that Dawn did the slaying, you will find that it was unlawfully done." It is evident, however, from the context, as well as the whole body of the charge, that the word "that" by mere clerical error is substituted for "whether," and that the jury could not have been misled by this inadvertence.

On the subject of conspiracy the Court said: "In finding what the truth is on this question (whether there was a conspiracy resulting in the

death of Mrs. Givens and defendant a party to it), you will apply the facts and circumstances in the light of your common sense as men, as you will do with reference to other questions in the case. You will remember, however, in determining this question, whether, in fact, there was one (a conspiracy) or not. You cannot look to or consider · anything which Dawn may have said when not in the presence or in the hearing of Givens, nor anything said to Dawn after the death of Mrs. · Givens."

This clause was directed to the first count, and it is objected to upon the ground, incorrectly assumed, that its effect was to have the jury, in determining the question of conspiracy, look to all the evidence in the case, except that specially excluded by the trial Judge from their consideration, and it is insisted that what the trial Court should have done was to call their attention to the specific parts of the testimony which they could consider on this question. This objection is not well taken. No such duty as is here insisted on devolved on the trial Court. His duty was fully discharged, when, excluding testimony as to Dawn's statements which they could not consider, he directed the jury in a general, but sufficiently intelligible way, to look to the proven facts bearing on this particular issue. This, in effect, is what he did do.

On the subject of statements made in the pres-

ence of plaintiff in error the Court said: "Part of the evidence in this cause consists in what is claimed to be statements of certain witnesses, made in the presence of defendant, what was thus said, I submit to you, together with what defendant did and said at the time, and the circumstances surrounding him at the time of such statements, with the instructions hereafter given. Statements thus made and which implicate one thus charged, if not denied or explained by the one charged, are considered as circumstances against the charged one. What statements (were) made in the presence of the defendant in the case, you must find, then, with reference to all the facts and circumstances surrounding. You will, for yourselves, fix the weight to be given to the evidence all taken together."

Taking this clause in connection with other and later portions of his charge, the trial Judge evidently meant, and we think the jury could not have understood otherwise, that as to these various statements the jury should take the testimony as to the conditions surrounding the prisoner when the particular statements were made and give such weight to it, as under these conditions it was entitled to , and not, as is insisted in error, that he told the jury to consider these with all the other testimony on every other question in the case.

We have examined the other criticisms made on

the charge, and without following them in detail, we deem it sufficient to say they are not well taken.

Again, there was no error in overruling the various grounds for a new trial.

1. After being accepted as a juror, one Aslinger was discharged by the Court upon the discovery that he was neither a householder, nor a freeholder. This was before the jury was fully made up and in the temporary absence of the prisoner. There was conflicting evidence as to whether the counsel for the prisoner waived his presence and the trial Judge says in the bill of exceptions that at least three counsel were present, and fully informed of the fact when the grounds of incompetency were called to his attention and acted upon by him, and that if not actually consenting, at least they made no objection of the Court's action. Having remained silent then, when an intimation from them would unquestionably have postponed the Court's action until their client was present, their protest after trial was too late.

2. The effort to show that Henderson, a juror, had prejudged the case failed. The statement alleged as a disqualifying one, which he, on his *voir dire,* confessed to have made, was not such. He did say in conversation with friends, had with regard to the current rumors as to the guilt of Givens, that "if he was guilty of mur-

dering his wife, he deserved to be hung." He did not profess a knowledge of the facts or express an opinion, even on rumor, as to the guilt or innocence of the prisoner. His expression was one that we think would come to the lips of anyone abhorrent of so unnatural a crime. As to the statement of Rebecca Jones, the fifteen-year-old daughter and companion of an unchaste mother, that this juror had said to her that he hoped he might be taken on the jury, as he wanted to hang Givens, it was positively denied by Henderson. This issue was for the trial Judge, and we see no reason to complain of him for accepting the denial, rather than the affirmation of this young girl, coming as she did, from disreputable surroundings.

3. One of the jurors trying this case was a minor, though a married man and a householder. This was an objection *propter defectum,* and came too late after verdict, though not discovered until then. *Draper* v. *State,* 4 Bax., 246; *McClure* v. *State,* 1 Yer., 206; *Gillespie* v. *State,* 8 Yer., 507; *Hamilton* v. *State,* 101 Tenn., 418.

The judgment of the lower Court is affirmed.