No. 19,667.

THE STATE OF KANSAS, *Appellee*, V. PAUL ROBERTS et al. (WALTER O. MULLINS, *Appellant*).

SYLLABUS BY THE COURT.

1. MURDER—*Trial—Verdict of Guilty—Death of Defendant—Verdict Should be Filed—Record Made.* Where a defendant in a murder trial dies after a jury finds a verdict but before it is presented in court, the verdict should be filed and the journal of the court should record the cessation of the trial and the reason therefor.

2. MURDER—*Joint Defendants—Information Sufficient.* An information charging defendant and two others with murder, giving time and place and the common recitals of a felonious charge, is sufficient although the theory of the prosecution is that the killing was committed by one of the others as a result of a conspiracy inspired by defendant and although the defendant was never personally present in the county where the homicide occurred.

3. MURDER—*Venue—County in Which Accessory May be Prosecuted.* Section 125 of the criminal code, which provides that an accessory to a felony may be prosecuted in the county where his part of the felony was committed, is permissive, not mandatory, and it is proper to prosecute him in the county where the principal offense was committed.

4. CHANGE OF VENUE—*Ordinarily in Judicial Discretion.* Rule followed that the determination of the trial court as to the propriety and necessity of a change of venue is final where

The State v. Mullins.

competent testimony supports that decision and where there is no apparent abuse of discretion.

5. TRIAL — *Endorsing Names on Information — Continuance.* Rule followed that a continuance is not ordinarily demandable as a matter of right because the names of witnesses are endorsed on the information at the commencement of a trial.

6. JURORS—*Qualification for Trial Court.* Rule followed that qualification of jurors is for the determination of the trial court.

7. MURDER—*Statements by Codefendant Made after the Murder Admissible against the Other Defendant.* Where a defendant is prosecuted for murder upon the theory that he procured another to do the deed, the sayings and doings of the other after the murder are admissible to prove the fact that such other did the killing, the establishment of that fact being a necessary prerequisite to the defendant's conviction.

8. MURDER—*Conspiracy—Statement of One Who Did the Killing Admissible under Proper Instructions.* Where two or three persons conspire to murder another and to shield and protect each other from discovery, prosecution and punishment therefor, the conspiracy is not concluded by the homicide so as to shut out all evidence after the murder which shows the sayings and doings of the one who did the killing, when that evidence is carefully restricted by clear and precise instructions to the jury that such evidence is only to be considered for the purpose of determining the guilt of the one who actually committed the deed.

9. SAME —*Conversation between One Conspirator and His Wife Admissible.* Where two or three persons conspire to murder another, there is no privilege which prevents the admissibility of conversations between one of the conspirators and his wife against another of the defendants on trial for the murder.

10. TRIAL—*Instructions Relating to Evidence of Detectives.* It is not necessary for the trial court to give special instructions concerning evidence given by detectives employed to unearth a crime.

11. EVIDENCE—*Detectives—Instructions—Cases Overruled.* The cases of *The State v. Snyder,* 8 Kan. 686, 57 Pac. 135, and *The State v. Shew,* 8 Kan. App. 679, 57 Pac. 137, are overruled.

Appeal from Wabaunsee district court; ROBERT C. HEIZER, judge. Opinion filed April 10, 1915. Affirmed.

*John E. Hessin*, of Manhattan, *W. S. Roark*, of Junction City, *William Bowes*, of Alma, and *Lee Monroe*, of Topeka, for the appellant.

*S. M. Brewster*, attorney-general, *John L. Hunt, S. N. Hawkes*, both assistant attorneys-general, and *Oscar Schmitz*, county attorney, for the appellee; *W. H. Carpenter*, of Marion, of counsel.

The opinion of the court was delivered by

DAWSON, J.: This is an appeal by Walter O. Mullins from a conviction for murder in the first degree in the district court of Wabaunsee county. The victim of this homicide was Anthony King, who for some years had been a policeman in Junction City but who had retired from the public service, and shortly before his assassination had moved to Alta Vista, in Wabaunsee county, and there engaged in conducting a restaurant.

Mullins was charged jointly with Paul Roberts and A. L. Hartman in the killing of King. The state's theory of the case was that Roberts killed King at the instigation of Mullins. Separate trials were demanded and allowed, and Roberts was tried first.

After the conclusion of the case against Roberts the jury retired and found a verdict and reappeared in court, and upon the order of the court to bring in Roberts to hear the verdict the sheriff reported that he was dead in his cell. On the objection of Roberts' counsel, who were also the attorneys for Mullins, the verdict in the Roberts case was not filed and no final judgment entered. The verdict should have been filed and the journal should have recorded the cessation of the case by Roberts' death.

In the state's case against Mullins, the evidence tended to establish the following facts: Mullins resided in Junction City. He had a large farm near town, and was also engaged in contract work and at times employed a number of laborers. Sometime in 1910, while Anthony King was a policeman in Junction City, Mul-

lins and King became unfriendly. In July of that year Mullins had a quarrel on the street with one Joe Baker, and King, the policeman, came up and ordered them to desist. Mullins called King a vile name and said, "You can't arrest me." King promptly knocked Mullins down and took him to jail. The blow was a severe one, and Mullins did not fully recover from its effects for several weeks. While still suffering from his injuries, Mullins drove out one day to his farm, accompanied by Fred Pickering, his employee, and Mullins offered Pickering "a good piece of money" to "get even with King." Next day Mullins suggested to Pickering how it might be done. He said, "King goes to the depot every night to pull the bums off the train. . . . You can get in between the cars . . . and get away with him that way." Mullins offered him $200 and a ticket to San Francisco. Pickering asked how he could escape, and Mullins said, "Leave that to me. I will take you to Riley Center, twenty miles north of Junction City, and put you on the Rock Island and you can get out that way." Mullins also said "he would get King if he had to send to Kansas City or Chicago . . . and get a big black nigger to get him."

Sometime later, King was shot at in the nighttime and his home burned, but no evidence connected Mullins with these crimes, although a witness who accompanied King to his home noticed that King kept looking behind, and the witness saw that Mullins was following them. King retired from the police force, and early in September, 1912, he moved to Alta Vista and conducted a restaurant. Mullins, who had resided in the South, made a visit to Junction, Ark., on the Louisiana border, in the spring of 1912. Paul Roberts resided at Bernice, La., a few miles farther south. Mullins and Roberts had been acquainted there, and in July, 1912, Roberts appeared in Junction City, Kan., and was seen in company with Mullins. Soon after, Roberts returned to his home in the South. There he packed his trunk, into

which he put buckshot shells, and told his wife on part-
ing, "I am going back to Kansas; Walter Mullins wants
me to do a job for him; I don't know but I expect the
job will get me into trouble, but there is plenty of
money in it, and as there is nothing but trouble for me,
I am going back to do it." Roberts then returned to
Junction City, Kan., and registered at a rooming house
under an assumed name. On leaving Louisiana he told
his wife to address him in care of Mullins. He was fre-
quently seen in company with Mullins, and also with
A. L. Hartman, the other codefendant. Roberts was
seen on several occasions with Mullins' team. About
the time King moved to Alta Vista, a Junction City
newspaper announced that he had moved to White City
to run a restaurant. Misled by this erroneous news
item, Roberts appeared in White City and inquired for
King's restaurant. Afterwards Roberts appeared in
Alta Vista and called at King's restaurant several
times. He drove Mullins' team to Alta Vista once or
twice. He pretended to be a mule buyer, and worked a
day or two at a quarry near by. Shortly before King's
murder, Roberts told his landlady in Junction City that
he had one trip to make and then he would be leaving,
and he removed his trunk from his boarding place. He
had a private conversation with Mullins the night be-
fore the murder. The morning of the murder he
showed his landlady a handful of gold. Roberts ap-
peared in Alta Vista the night of the murder and was
seen in King's restaurant a few minutes before two
shots were heard. Shortly afterwards Roberts came
to the village hotel, and appeared excited and talked of
killing. Roberts was a worthless character, a drunk-
ard, drug fiend, gambler and braggart, and was wont
to talk of killing people. In the presence of the land-
lord he drank several times from a whisky bottle,
offered the landlord a drink, and later Roberts and one
Murphy drank in Roberts' room, and Roberts recounted
some of his killing stories to Murphy. Next morning

King was found dead in his restaurant, with buckshot wounds in his body. Roberts was taken into custody by the city marshal and a deputy sheriff who accompanied Roberts to his room. A letter to Roberts' wife was found which read: "Myrtle, . . . I am gone from here and am in very serious trouble." On being asked if he knew Mullins, Roberts hesitated, saying first that he did not and later that he believed he did. The same forenoon the news of King's death was telephoned to Junction City, and a local newspaper posted a bulletin to that effect, but gave no details as to how he came by his death. Among those who read the bulletin was Mullins, who immediately remarked to a bystander, "Bently, you know I never had any use for Anthony King, it was a cowardly trick *to shoot a man down like that.*"

Roberts' first arrest was under a nominal charge of drunkenness. A. L. Hartman, later his co-defendant, appeared in Alma, the county seat, to give bond for Roberts, and finding the bond fixed at $1000, he returned to Junction City on a night train. Mullins met him and they retired in the darkness together and next day they went together to the office of a lawyer in Manhattan. Up to this time Roberts had no opportunity to communicate with Mullins. The Manhattan attorney immediately set about securing the release of Roberts. About this time the county attorney of Wabaunsee county filed complaint against Roberts for the murder of King and wired an attorney to meet him in Topeka, the county attorney intending to employ him to assist in prosecuting Roberts. When the county attorney arrived in Topeka to secure the services of this lawyer, he found Mullins had anticipated him and had already engaged this attorney to defend Roberts. About this time Fred Pickering, who had been offered money and a ticket to San Francisco by Mullins to kill King, was heard to say that he knew a good deal about the killing of King, and this was reported to the sheriff who

brought Pickering to Alma where he made an affidavit. When this was learned by "Buddy Brooks," a friend of Mullins, Brooks had a counter-affidavit prepared for Pickering who was to receive $50 for signing it and leaving the state. Pickering signed the counter-affidavit, but instead of delivering it to Brooks he started with it for Alma to give it to the county attorney; whereupon Mullins had Pickering arrested on a charge of blackmail, but the case was dismissed. While Roberts was in jail pending his trial for the murder of King, the county commissioners of Wabaunsee county employed detectives to collect evidence concerning the homicide. One of these was placed in jail on a pretended charge and he secured the confidence of Roberts; and Roberts urged him to procure two witnesses to swear that he, Roberts, was sitting at the railroad depot at the time the two shots were heard, and assured him that the witnesses would be well paid for such testimony. Another detective pretended to be the emissary of Dave Simmons, a Kansas City saloon keeper and cousin of Mullins, and he said to Roberts, "Dave told me all about it." Roberts replied, "You know then why it was done and how it was done." The testimony of this detective was corroborated by the clerk of the district court who heard this conversation over a dictaphone which had been secreted where Roberts' talk with the detective could be overheard. Another circumstance was that Roberts had been properly searched when he was placed in jail, and after a visit from Mullins and Hartman a dirk with a nine-inch blade and a whetstone were found concealed in his mattress. At another time, and after the original charge of murder against Roberts was withdrawn and a new complaint filed charging Roberts, Mullins and Hartman with the murder of King, and when Roberts and Mullins were in jail, Roberts was heard to ask Mullins, "Do you suppose he (Hartman) would tell anything if they happened to catch him?" and Mullins replied that

he did not know, but that Hartman was "pretty damn mouthy."

The foregoing and numerous other and similar incidents composed the state's case against Roberts and Mullins.

The atrocity of the murder, the employment of detectives, the employment of distinguished lawyers to defend Roberts who was a mere vagabond, the incidents of the dictaphone, a quarrel between the sheriff and one of the state's detectives on the public streets of Alma where shots were fired and a bystander was struck by a chance bullet, the finding of the dirk in Roberts' cell, the tragic close of the Roberts' trial when he was found dead in his cell—all these circumstances tended to give the case against Mullins much notoriety. There are five newspapers in the county and the happenings pursuant to the murder of King were chronicled with much detail in that usually quiet rural community. This situation was made the basis for a vigorous but unsuccessful effort on the part of counsel for Mullins to secure a change of venue.

Mullins was convicted of murder in the first degree, and brings his cause here for review. A long assignment of errors is set forth, the chief of which will be examined in the order of their presentation.

1. The information was the ordinary stereotyped charge that the defendants, Roberts, Mullins and Hartman, did then and there, etc., kill and murder one Anthony King, with a certain shotgun, etc., which the defendants in their hands had and held, etc. Against this, counsel for Mullins directed a motion to require the information to be made more specific as to the manner and means by which the homicide was committed and to set out the particular acts done by each of the defendants in its commission. In this connection appellant cites section 125 of the criminal code and contends that if this motion had been sustained the information would properly have shown that Mullins' acts

in bringing about the death of King were performed, so far as he was personally concerned, outside of Wabaunsee county. But section 115 of the criminal code provides that any person who counsels, aids or abets in the commission of any felony may be charged, tried and convicted as if he were a principal. Section 125 merely says the accessory may be prosecuted in any county where the offense of such accessory was committed, not that he must be. On the other phase of the motion, that the defendant might be advised of the particulars of the offense with which he was charged, there had been two preliminary trials and the trial of Roberts in the district court, at all of which defendant and his counsel were present, and he was thoroughly advised of the charge and the nature of the proof which he would have to meet. The motion was properly overruled. (*The State v. Cassady,* 12 Kan. 550; *State v. Beebe,* 66 Wash. 463, 120 Pac. 122.)

2. A more meritorious complaint is presented on the ground that the motion for a change of venue was overruled. In our preliminary statement we noted the unusual incidents which tended to give this case notoriety and which might raise a doubt as to the probability of defendant receiving a fair trial in Wabaunsee county. That the district court keenly appreciated its responsibility in this respect is evidenced by the exhaustive hearing which was given to this motion. Defendant made a strong showing by many witnesses to the effect that he could not get a fair trial in that county. On the other hand, the state produced affidavits from almost a hundred persons residing in all parts of the county which contradicted the defendant's showing, and which tended to prove that there was no prejudice against the defendant. While this showing was largely by affidavits, yet witnesses were produced, and upon cross-examination it was shown that no such prejudice against the defendant existed as might be imagined

from a casual reading of this voluminous and remarkable record. However, upon ample testimony presented by the state and by defendant, the district court decided that a change of venue was not necessary, and its judgment ordinarily must control. (*The State v. Furbeck,* 29 Kan. 532; *The State v. Daugherty,* 63 Kan. 473, 476, 65 Pac. 695; *The State v. Parmenter,* 70 Kan. 513, 516, 79 Pac. 123; *The State v. Bassnett,* 80 Kan. 392, 102 Pac. 461.)

In *The State v. Stewart,* 85 Kan. 404, 116 Pac. 489, it was said:

"A ruling refusing to grant an application for a change of venue because of the prejudice of the citizens of the county will not be reversed where the decision is based on conflicting evidence as to the existence of such prejudice." (Syl. ¶ 1.)

3. When this case was called for trial the state obtained leave to endorse the names of nine witnesses. No objection was made to these endorsements except as to the witness Ward. When Ward's name was permitted to be endorsed, defendant moved for a continuance. This was refused, and an hour's recess taken so that counsel for the state might apprise defendant of what it expected to prove by Ward. This proved to be a minor matter; that this witness had accompanied Anthony King to his home one night in Junction City, and that Mullins followed them. The subpœna was issued for Ward on January 27, 1914. Of this fact one of the defendant's attorneys had notice. Ward's name was endorsed February 3, 1914, and the state did not close its case until two weeks later. The belated endorsement of the name of this witness did not prejudice the defendant, and the application for a continuance was properly overruled. (*The State v. Cook,* 30 Kan. 82, syl. ¶ 1, 1 Pac. 32; *The State v. Taylor,* 36 Kan. 329, syl. ¶ 5, 336, 13 Pac. 550; *The State v. Price,* 55 Kan. 606, 40 Pac. 1000.) In the latter case this court said:

"Of course, the trial courts ought to be very careful,

in the exercise of a discretionary power like this, to require the county attorney to act fairly; and in the event of surprise of the defendant by the bringing in of witnesses that he could not anticipate, time should be granted, even to the extent of a continuance if necessary, to the ends of justice. But it is only where the court abuses its discretion in this respect that error will lie, and we cannot say that there was any abuse of discretion in the present instance." (p. 608.)

4. The next error assigned is the overruling of defendant's challenge for cause to jurors Neidfeldt, Schrader and Strassen, and that he was compelled to exercise his peremptory challenges to get rid of them. The guilt of Roberts was one of the vital issues in the case against appellant. Unless Roberts killed King, the whole case against Mullins, his putative instigator and accessory, was bound to fail. Juror Neidfeldt on his *voir dire* had read that Roberts was found guilty at his trial; that he had talked with a juror who sat in the Roberts case who told him what the verdict was, and that he believed he had been told the truth as to that verdict. Juror Schrader had seen King's body and read the accounts in the newspapers; he had heard of the Roberts verdict, but had forgotten what it was. Juror Strassen had read and heard of the murder and Mullins' supposed connection with it; he had formed and expressed an opinion as to what became of Roberts, and had learned that a verdict had been rendered against him. Strassen also had made an affidavit for the state for use in this case, but what were its contents was not disclosed. Another juror, C. M. Schroeder, had seen the verdict in the Roberts case, and said that it would take some evidence to remove his supposition that Roberts had caused King's death. However, these jurors fairly showed themselves competent and unbiased in other portions of their examination. The law has become firmly settled in this state that the qualifications of jurors are to be determined like other

The State v. Mullins.

questions of fact, and the decision of the trial court, if supported by substantial testimony, ordinarily will not be disturbed. (*The State v. Morrison,* 64 Kan. 669, 678, 68 Pac. 48; *The State v. Stewart,* 85 Kan. 404, 409-411, 116 Pac. 489; *The State v. Pearce,* 87 Kan. 457, 462, 124 Pac. 814.)

5. It is next urged that the admission of testimony showing certain acts and declarations of Roberts and other incidents after the homicide was effected, when defendant was not present, was erroneous and prejudicial. This evidence covered the conduct and statements of Roberts the morning after the murder; what he said to the marshal, the deputy sheriff and the landlady at the hotel; his comment on his letter to his wife; the various efforts to get bond for Roberts; Billings' talk with Roberts in jail; the testimony of the detectives as to what Roberts said to them; the secreting and use of the dictaphone; Roberts' letter to Dave Simmons, and a mass of similar matters. These incidents were all competent to prove the fact that Roberts killed King. That fact, the killing of King by Roberts, was a prime necessity in the state's case against Mullins. Over and over again the court ruled against the objections of defendant to this class of testimony, usually explaining his ruling that this evidence was only admissible to prove the killing of King by Roberts, and he repeatedly admonished the jury to consider it only for the determination of that fact. This was also carefully covered by the final instructions to the jury. The twenty-sixth instruction will illustrate:

"26. Certain alleged statements, acts and declarations of Paul Roberts after the time of the death of Anthony King and not made or done in the presence of the defendant Mullins were allowed to be testified to by witnesses in the case; this was permitted by the court for the purpose of enabling you to determine the question of the guilt or innocence of Paul Roberts only, and you will consider them for no other purpose."

On this point the state contends that this restriction of the use of this evidence was error to the prejudice of the state; that the conspiracy which it was striving to prove not only contemplated the killing of King, but that it was also intended that the conspirators should shield each other and that Roberts should have the assistance of his co-conspirators to evade conviction and make his escape. In other words, the state's theory was that the conspiracy of Mullins, Roberts and Hartman was (1) to effect the death of King and (2) to avoid its consequences.

Under the restrictions imposed by the court, instructing the jury to consider it only for the determination of the fact as to whether King came to his death at the hands of Roberts, this line of evidence was properly admitted. Why not? Was the power of the state restricted in its hunt for truth against the assassin, because the development of that truth would likewise develop damaging evidence against the confederate of that assassin? Was the trial judge required to tie the hands of the prosecuting attorney by ruling out competent testimony to establish the guilt of Roberts because it was damaging against Mullins, when the establishment of the guilt of Roberts was essential to the case against Mullins? These questions answer themselves, and they are answered in effect by the precedents of this court. (*The State v. Cole*, 22 Kan. 474; *The State v. Mosley*, 31 Kan. 355, 2 Pac. 782; *The State v. Peterson*, 38 Kan. 204, 16 Pac. 263; *The State v. Reed*, 53 Kan. 767, 774, 37 Pac. 174; *The State v. Wilcox*, 90 Kan. 80, 94, 132 Pac. 982.) To the same effect are the modern authorities. (2 Wigmore on Evidence, § 1079; 3 Bishop's New Criminal Procedure, 2d ed., pp. 1229, 1230; Wharton's Criminal Evidence, 8th ed., § 702.) Note, also, the progress of the law as shown in *Self v. The State*, 65 Tenn. 244; *Morrow and Bellamy v. The State*, 82 Tenn. 475; and *Givens v. State*, 103 Tenn. 648, 55 S. W. 1107. (See, also, *Smith v. The State of*

*Georgia,* 46 Ga. 298; *Howard v. The State,* 109 Ga. 137, 34 S. E. 330; *Commonwealth v. Scott,* 123 Mass. 222; *Commonwealth v. Smith,* 151 Mass. 491, 24 S. E. 677; *Grogan v. The State,* 63 Miss. 147; *State v. Duncan,* 28 N. Car. 98; *State v. Rand,* 33 N. H. 216; *State v. Mann,* 39 Wash. 144, 81 Pac. 561.)

But certain Kansas cases are urged upon our attention as holding a contrary view. Let us examine them. In *The State v. Patterson,* 52 Kan. 335, 34 Pac. 784, it was held:

"By the statute of this state, the distinction between a principal in the second degree and an accessory before the fact has been abolished, and all participants in a crime are declared equally and alike guilty, without regard to their proximity thereto or the extent of their participation therein. (*The State v. Cassady,* 12 Kan. 550.) In this connection, it is proper to remark that, in the case of *The State v. Mosley,* 31 Kan. 355, 2 Pac. 782, it was rightly decided that 'Upon the trial of an accessory before the fact, the record of the conviction of the principal is proof *prima facie* of that fact; but this is not conclusive, and other evidence of the commission of the crime by the principal is admissible.' But this court probably went too far in that case, in saying that the statements of the principal, Mrs. Martin, were admissible against Mosley, if they were made in his absence. At common law, such statements of a principal were admissible to charge an accessory, but under our statute and the authority of *The State v. Bogue,* 52 Kan. 79, 34 Pac. 410, such declarations, not made in the presence of the accessory, are not receivable." (p. 352.)

In the Bogue case referred to, it was held that evidence of the declarations of a defendant principal, in the absence of the accessory and long after the consummation of the criminal acts, were inadmissible against the accessory.

Upon examination of the Patterson case, we note that the above quotation was a dictum and not even a positive dictum, and the expressed misgiving of the court as to the correctness of its earlier decision in the Mosley

case was not well founded.  If, as conceded, the record of the conviction of the principal is proof *prima facie* of that fact on the trial of an accessory, the competent facts whereby the principal's guilt was established should be likewise admissible to establish that fact in the trial of the accessory, whenever the principal's guilt is an essential fact in the foundation of the case against the accessory.  This was not the Patterson case at all.  The fact as to who slew Hinton in the Patterson case was not in issue.  It may be, however, that in deference to the dictum in the Patterson case, the trial court in this case felt constrained to restrict the consideration of the evidence of the sayings and doings of Roberts, after the homicide and in defendant's absence, solely to the determination of the fact of the killing of King by Roberts.  It might be admissible on the ground that the conspiracy did not terminate and was not intended to terminate until the conspirators had come off scot-free from their main offense.  According to some authorities, this restriction on the use of this evidence was unnecessary.  Bishop in his. new work on Criminal Procedure, 2d ed., vol. 3, at page 1229, lays down the broad rule that " 'Whatever is evidence against the principal is *prima facie* evidence of the principal felony as against the accessory.' "  This rule seems logical and proper, but we only quote it here, not to say that our law goes thus far, but to show how well within any debatable border-line the trial court in this case restricted the application of the testimony.

The case of *The State v. Rogers,* 54 Kan. 683, 39 Pac. 219, which is pressed upon our attention takes nothing from the force of what is here said, nor from the authorities cited.  In that case Rogers is alleged to have secured Shirley to hire others to burn the county records.  The hirelings were present in court and testified that they burned the records.  The decision of the majority of the court was that an extrajudicial admission by an accessory, made in the absence

The State v. Mullins.

of the principal or other accessory after the consummation of the crime, was inadmissible on the trial of the principal or other accessory to establish the guilt of such person on trial; but the result might have been otherwise if the purpose of its admission was merely to prove the fact of the crime, and not primarily to prove the guilt of an accessory.

6. The question of the sufficiency of the evidence to establish the conspiracy and to connect Mullins with it will be considered later.

7. Was it error to admit the testimony of the wife of Paul Roberts as to Roberts' conversations with her? Counsel for appellant most strenuously insist that it was. At common law the husband and wife were incompetent to testify for or against each other in either civil or criminal proceedings. (40 Cyc. 2210.) However, this disability has long been modified by statutory regulations. By our civil code (§ 321, subdiv. 3) it is provided that the husband and wife are incompetent to testify, for or against either, concerning any communication made by one to the other, whether called as witnesses while that relation subsisted or afterwards. By our criminal code (§ 215) it is provided that no person shall be rendered incompetent to testify in criminal causes by reason of being the husband or wife of the accused, but any such facts may be shown for the purpose of affecting his or her credibility; and it is also provided that neither the wife nor husband of a person on trial shall be required to testify as a witness except on behalf of the accused spouse on trial. Both sections have been the subject of much judicial comment and interpretation. What simplifies the matter at bar is that not the spouse but the codefendant of the spouse is on trial. Has he any protection from the limitations, if such there are in criminal cases, upon the admissibility of private communications between Roberts and his wife? Some of the authorities cited by appellant may be fairly said to go to that extent. But is not the question concluded by the decisions of this court?

‘ In *The State v. McCord,* 8 Kan. 232, it was held:

"Under the statute of 1871 the wife of the accused is a competent witness for the state in the trial of her husband for a criminal offense. The court cannot require her to testify, but may permit her to do so voluntarily." (Syl. ¶ 2.)

In *The State v. Buffington,* 20 Kan. 599, it was said:

"And while the criminal code provides that the provisions of law in civil cases relative to 'compelling the attendance and testimony of witnesses,' and 'their examination,' 'shall extend to criminal cases,' yet it does not provide that the provisions of law in civil cases relating to the competency of witnesses and the competency of evidence shall extend to criminal cases. (*The State v. Howard,* 19 Kan. 509, 510.)" (p. 615.)

In *The State v. Harp,* 31 Kan. 496, 3 Pac. 432, it was said:

· " 'Our criminal code has wisely discarded in pleading many of the old forms of expression and technical requirements which only served to unlock the doors of prisons, and allow the guilty to go free.' " (p. 500.)

In *The State v. Pearce,* 87 Kan. 457, 124 Pac. 814, it was said:

"Error is assigned on the admission of the testimony of Mrs. Silvey, the wife of the deceased, to the effect that on the morning of the shooting Silvey started with the horses and stated to her that he was going to take them to graze on the Silknitter tract of land. There is nothing in the criminal code which bars her from being a witness for the state or from testifying to any fact of which she has knowledge. The legislature has removed restrictions by providing that no person is incompetent to testify in a criminal case by reason of being the party injured or defrauded, or intended to be injured or defrauded, or by reason of being the husband or wife of the accused, and that either may voluntarily testify in behalf of the other but can not be compelled to testify against each other. (Crim. Code, § 215.) The civil code, to which reference is made, was so modified in the revision that a husband or wife is only declared to be incompetent to testify as to communications made by one to the other during marriage where they are

called to testify for or against each other. (Civ. Code, § 321.) If this section were deemed to apply (and it does not), it would not operate to exclude the testimony of Mrs. Silvey as she was not asked to testify against or for her husband. There is, therefore, no statutory disqualification of the witness, but it is contended that she is incompetent to testify under the principles of the common law. This rule, if controlling, only makes the husband or wife incompetent to testify for or against each other." (p. 462.)

This declared policy of our state law was still later reviewed in *The State v. Marsee,* 93 Kan. 600, 144 Pac. 833, where it was again said:

"The criminal code provides in set terms that no person shall be rendered incompetent to testify by reason of being the husband or wife of the accused. (Crim. Code, § 215.)" (p. 604.)

Such being the settled law of this state, when one spouse may testify against the other on trial in a criminal case, the objection to the competency of Roberts' wife as a witness and to the competency of her testimony against Mullins can not be sustained. The matter is thoroughly discussed in 3 Wigmore on Evidence, § 2227 *et seq.* It will be observed that Roberts was dead when Mrs. Roberts' evidence was given against Mullins, but we must concede that counsel present some respectable authorities that even then her lips would be sealed, although their reasoning does not commend itself to our judgment. Wigmore states the better doctrine and supports it with ample authority:

"Can there be dissension with the *manes* of a departed? Is there for married pairs a posthumous peace, capable of fracture by service of subpœna upon the survivor, and therefore fit to be forefended by the law? If so, then the privilege should extend a *post mortem* protection. But unless we assume such a theory, the privilege ceases upon the death of a spouse. It is true that, among the varying reasons for the privilege, one of them does suggest a rational extension beyond the life of the parties, namely, that policy of fairness which aims to exempt husband and wife from

the repugnancy of being the means of condemning the other (*ante,* § 2228, p. 15) ; for this repugnance must exist also, in some degree, to a condemnation of the memory of the departed one. But (apart from the argument that this reason has by no means been a generally accepted one) the answer is that a detriment of such exiguous delicacy could not with propriety be allowed to stand in the way of the judicial establishment of truth. Moreover, looking back at the principle which defines testimony 'against' a spouse as testimony against a spouse who is a party to the cause (*ante,* § 2234), it is obvious that, since a deceased person cannot be a party, testimony concerning the deceased person can never be said to be testimony 'against' a spouse.

"And what is to be said of a divorced spouse? Does the privilege there also continue? After the grave cause for dissolution—adultery, desertion, crime, or the like—has come to pass, and the parties have been not only alienated in spirit, but also solemnly freed, by judicial decree, from the obligations of a mutual concord and concession, is there any longer, either in fact or in policy, a marital peace which must be kept inviolable? Or is the legal fiction so elastic and so artificial that it can afford to dispense with even a modicum of fact for its support, and can be deemed to exist even after the bonds of matrimony have been loosed? There ought to be no doubt that this would be carrying too far the fantasies of legal pretence..

"There is no privilege, then, which prevents the surviving spouse from testifying, after the death of the other, in disparagement of the conduct or the property of the deceased; nor is it material that the testimony relates to matters which occurred during the marriage. The few rulings taking the contrary view are misled by the analogy of a different privilege, namely, that which prohibits the disclosure of marital confidential communications. It is a legitimate corollary of that privilege (*post,* § 2341), that it prevails even after the death of one spouse. But the two privileges are entirely distinct; the former, for example, has been in many jurisdictions abolished, while the latter has been nowhere abolished. The reason of the former privilege ceases with death; that of the latter does not. Each has a separate scope; for example, a wife might be prevented

The State v. Mullins.

from revealing a confidential communication, even though not testifying against her husband; and she might be prevented from testifying against her husband, though her testimony involved no confidences. Thus it is that a wife, after the husband's death, is not privileged to withhold facts involving disparagement of his conduct or estate during life, so long as she does not violate the other and distinct privilege against disclosing confidential communications.

"So, too, after divorce, there is no privilege to withhold the testimony of either; although in a few courts the same confusion has here also appeared between the present privilege and the privilege for confidential communications." (3 Wigmore on Evidence, § 2237.)

We acknowledge the formidable line of authorities presented by counsel which apparently do not accord with these views, but they do not shake our approval of those which we have cited.

Some other errors assigned may be briefly disposed of. It is urged that Fred Pickering's testimony should have been excluded because it only related to Mullins' attitude towards King in the summer of 1910 while the murder of King did not occur until September, 1912. Cases are cited to show that evidence of threats made four or five years before the homicide was too remote. (*Mackmasters v. State,* 81 Miss. 374, 33 South. 2.) We observe from the record that Pickering's testimony was not objected to at the trial and it would be too late to challenge its competency for the first time here. But Pickering's evidence was competent and admissible.

8. It does not appear necessary to do more than note the next error assigned, which was the overruling of the motion to direct a verdict of acquittal. A contrary ruling would have been highly improper.

9. Counsel for appellant complain of the general tone of the court's instructions. Fault is found that they opened with an admonition to the jury to do its duty, "to see that the majesty and purity of the law is vindicated, . . . and . . . that upon the honest,

impartial and rigid enforcement of the laws of the land depends the life of the citizens and proper enjoyment of all their rights; . . . The certainty of punishment is one of the surest remedies for the prevention of crime. . . . And without a just, rigid and impartial enforcement of the laws of the land, none of these rights are secure."

Counsel say: "Why should all these things have been hammered into the jury?" We perceive no error here. Surely it can not be the law that a judge may not remind the jury of their solemn duties and responsibilities not only toward the accused but to organized society as well—that organized society, the state, which is the other party to the litigation, and which is also in court with its grievance, charging the violation of its laws and the murder of one of its citizens in violation of those laws.

True it is, that the rights of the accused are likewise entitled to the most liberal protection. That was not forgotten by the court. In the same paragraph in which the court admonished the jury as to its duty to the public, it likewise said:

"And I further remind you that no man can be lawfully punished, however guilty he may be, until that guilt is first ascertained and declared by a jury of his countrymen. . . . The rights of the defendant are sacred to him, and you are bound to be especially careful that an innocent man shall not be punished and disgraced; that no injustice be done to him, and that he have the benefit of every reasonable doubt, and of that just presumption of innocence which the law, not only mercifully, but wisely and justly clothes and invests him."

10. Counsel criticise the following instruction:

"12. The rule of law which throws around the defendant the presumption of innocence and requires the state to establish beyond a reasonable doubt every material fact averred in the information is not intended to shield those who are actually guilty from just and merited punishment, but it is the humane provision of

the law which is intended for the protection of the innocent and to guard so far as human agency goes, against the conviction of those unjustly accused of crime."

The instruction is a common one in Kansas, and has probably been given many times since its approval *in haec verba* in *The State v. Medley*, 54 Kan. 627, 629, 39 Pac. 227.

Complaint is made of the 11th instruction:

"11. I further instruct you that you can not convict the defendant of any crime unless his guilt is proven to your satisfaction beyond a reasonable doubt. In the use of the term 'reasonable doubt,' I do not mean any possible doubt; a mere speculation or captious quibble suggested for the purpose of evading the performance of an honest duty, but I mean such a fair and reasonable uncertainty concerning the falsity or truth of any matter or thing as would naturally and honestly be suggested to the mind of any candid and conscientious man after a careful and impartial consideration of such matter if submitted to him for examination and determination; and so long as there is such a reasonable doubt of guilt being satisfactorily proven by the evidence the defendant must be acquitted."

This is the substance of many approved instructions. (*The State v. Patton*, 66 Kan. 486, 71 Pac. 840, and cases cited.)

11. Another instruction complained of reads:

"17. The court instructs the jury that circumstantial evidence is legal and competent in criminal cases, and if it is of such a character as to exclude every reasonable hypothesis other than that the defendant is guilty, it is entitled to the same weight as direct testimony."

Here it is insisted that in the use of the word "weight" the court was permitting itself to comment on the *weight, credit and value* of the testimony, which was an invasion of the jury's exclusive province. This is too refined a criticism. The court only stated a proposition of established law, nor does the context bear out the inference that the court was seeking to

impose its opinion on the jury. The court merely meant that circumstantial evidence was legal evidence and entitled in law to weight and credence in reaching their verdict. The mere use of the word "weight" could not have been distorted by the jury into an expression of the court's own opinion of its probative value.

12. It is next contended that the court erred in refusing to charge the jury that they could not convict the appellant in the absence of proof beyond a reasonable doubt that Roberts had murdered King. The complete answer is that the court fully covered this very point at least twice, in the 22d and 31st instructions, but space forbids their reproduction here.

13. It is next urged that the court should have admonished the jury with particular care as to the testimony of the detectives, and Nebraska cases are cited to that effect. That would come close to commenting on the "weight" of evidence, against which on the mere use of the word "weight" counsel have strongly inveighed. The whole matter was properly and fully covered in the general instruction to the jury:

"8. You are the exclusive judges of the evidence in the case, of its weight, credit and value; and you are likewise the exclusive judges of the credibility of the witnesses and it is for you to determine the force and effect to be given to the testimony of each of them; and in determining this question you may take into consideration any bias, prejudice or unfairness that may have been manifested by any witness in giving his or her testimony, also any interest that the witnesses may appear to have in the result of the action, as well as the means and opportunities of the witnesses for knowing the facts about which they have testified."

Detectives perform a valuable and necessary function in modern society. They are merely private citizens trained in the collection of evidence against criminals and in the study of the habits of criminals. Modern governments which are in earnest in seeing that their laws are enforced, that their coinage is preserved from counterfeiting, that their mails are free

from molestation and robbery, make free use of detectives and secret service men. The profession of detectives may be regulated by law, but no sound reason can be suggested why their testimony should be singled out as deserving of less credence than the evidence of witnesses in general. Their credibility may be subjected to strict cross-examination, and counsel for the defense may comment freely upon their testimony in argument; but even in this respect the same broad range of comment is accorded to counsel to discuss the credibility of all witnesses. These views are supported by: *The State v. Keys,* 4 Kan. App. 14, 45 Pac. 727; *The State v. Eaton,* 5 Kan. App. 55, 47 Pac. 317; *The State v. Pigg,* 78 Kan. 618, 97 Pac. 859; *The State v. Spiker,* 88 Kan. 644, 129 Pac. 195; *The State v. Gray,* 90 Kan. 486, 135 Pac. 566; *Clark v. The State,* 5 Ga. App. 605, 63 S. E. 606; *Burns v. The People,* 45 Ill. App. 70; *The President and Trustees of the Town of St. Charles v. O'Mailey,* 18 Ill. 407; *In re Wellcome,* 23 Mont. 450, 59 Pac. 445; *State v. Tudor,* 47 Mont. 185, 131 Pac. 632, and 40 Cyc. 2605, 2655. The cases to the contrary, *The State v. Snyder,* 8 Kan. App. 686, 57 Pac. 135, and *The State v. Shew,* 8 Kan. App. 679, 57 Pac. 137, are overruled.

14. Still another complaint of appellant is that of misconduct of counsel for the state. It is said that allusions were made in the state's closing argument to the fact that defendant did not take the stand in his own behalf; that the defendant did not call his codefendant Hartman as a witness; that appellant's wife, who testified in her husband's behalf as to certain matters, was not examined as to others; that appeals were made to the fears, passions and prejudices of the jury.

We have examined these matters with care. Doubtless the state's counsel was zealous, fervid and passionate and full of the spirit of his cause, but he apparently kept within the limits of fair debate. Nothing approaching reversible error occurred. (*The State v.*

*Yordi,* 30 Kan. 221, 2 Pac. 161; *The State v. Glave,* 51 Kan. 330, 33 Pac. 8; *The State v. Hinkley,* 81 Kan. 838, 106 Pac. 1088; *The State v. Olsen,* 88 Kan. 136, 127 Pac. 625; *The State v. Miller,* 90 Kan. 230, 133 Pac. 878; *City of Topeka v. Briggs,* 90 Kan. 843, 135 Pac. 1184.)

This concludes the main questions raised by appellant. Was the conspiracy established? Was Mullins' connection with it proved? The trial was a long one; the evidence against the defendant consisted of many circumstances, which required the examination of many witnesses. The record fairly substantiates the state's theory of the murder of Anthony King and of Mullins' guilt. It shows his motive and avowed purpose to accomplish King's death; it fairly shows that that purpose was followed until its culmination; it fairly shows that Roberts did the deed at Mullins' instigation. These matters were all sufficiently established to require their submission to the jury. (5 R. C. L. 1088; 8 Cyc. 678.) In their brief, counsel for defendant protest repeatedly that their client did not get a fair trial, and say "that it ought not to be an entirely hopeless undertaking to defend one charged with murder." The duty of counsel is to use their talents and zeal to prevent the conviction of the innocent and to secure for every defendant a fair trial; and when, notwithstanding their talents, the guilty do not escape, their duty is fully discharged and they need indulge in no vain regrets.

The judgment is affirmed.